KANSAS SAND AND CONCRETE, INC., TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

KANSAS SAND AND CONCRETE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1854–69, 3833–69. Filed June 17, 1971.

*Murray, F. Hardesty,* for the petitioners.
*Edward G. Lavery,* for the respondent.

FORRESTER, *Judge:* In docket No. 3833-69, respondent has determined deficiencies in petitioner's income taxes of $10,711.27 and $12,162.28 for the taxable years ending in 1965 and 1966, respectively. In docket No. 1854-69 respondent has determined that petitioner is liable as transferee of the assets of Kansas Sand Co., Inc. (hereinafter referred to as Sand), for an income tax deficiency of $2,015.38 for the taxable year ending in 1964. The parties agree that in docket No. 1854-69 petitioner is liable as transferee for any income tax deficiency that may be due from Sand for the taxable year ending in 1964. The only issue remaining for our decision is whether the basis of certain assets held by petitioner should be computed by reference to section 334(b)(2) or by reference to section 362(b).[1]

All of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

Petitioner is a Kansas corporation whose principal place of business at the time of the filing of the petition herein was in Topeka, Kans. Petitioner filed Federal corporation income tax returns for the taxable years ending December 31, 1965, and December 31, 1966, with the district director of internal revenue in Wichita, Kans. On March 18, 1968, petitioner filed an amended Federal corporation income tax return for the taxable year ending December 31, 1966, with the district director of internal revenue in Wichita, Kans. Sand was a Kansas corporation and filed a Federal corporation income tax return for the taxable year ending December 31, 1964, with the district director of internal revenue in Wichita, Kans. On March 15, 1966, an amended Federal corporation income tax return for the taxable year ending December 31, 1964, was filed for Sand with the district director of internal revenue in Wichita, Kans.

On September 28, 1964, petitioner purchased from Fred Kuehne and Kathryn Kuehne all of the 1,050 outstanding shares of Sand's stock. Petitioner continued to own all of his stock until December 31, 1964.

Petitioner (also referred to as Concrete) and Sand entered into an "Agreement and Plan of Merger" which was dated November 30, 1964, and which is hereinafter referred to as the November agreement. The stipulated purposes of the November agreement were "to ease the

---

[1] Unless otherwise stated all section references are to the Internal Revenue Code of 1954 as in effect for the years in question.

burden of record keeping, centralize management, etc." The November agreement provided in part as follows:

2. TERMS OF MERGER.

The terms of the merger are:

(a) Sand shall be merged into Concrete in accordance with the statutory procedure set forth in the General Statutes of Kansas, 1949, Sections 17–3701 through 17–3709, as amended.

(b) Concrete shall be the surviving corporation and the corporate identity, existence, purposes, powers, franchises, rights, and immunities of Concrete shall continue unaffected and unimpaired by the merger. The Articles of Incorporation and the By-Laws, each as heretofore amended of Concrete shall remain in effect unaltered as the Articles of Incorporation and the By-Laws of the surviving corporation, and the duly qualified and acting directors and officers of Concrete immediately prior to the time when the merger becomes effective as provided in paragraph 5 hereof, hereinafter called the Effective Time, shall be the directors and officers of the surviving corporation.

(c) The corporate identity, existence, purposes, powers, franchises, rights, and immunities of Sand shall be merged into Concrete and Concrete shall be fully vested therewith.

(d) The separate existence of Sand, except insofar as specifically otherwise provided by law, shall cease at the Effective Time, whereupon Concrete and Sand shall become a single corporation.

(e) At the Effective Time, all of the outstanding shares of common stock of Sand, of which Sand is then the holder of record, if any, shall be void, and each other outstanding share of such common stock of Sand shall be converted into one share of common stock of Concrete, fully paid and nonassessable by Concrete.

(f) At the Effective Time, all option agreements, if any, then outstanding entered into pursuant to any agreement by Sand shall be vested in and assumed by Concrete.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

6. DIRECTORS AND OFFICERS. The directors and all officers of the two corporations shall take all necessary action and file all necessary forms and papers to effect this Agreement and Plan of Merger without gain or loss or tax consequences for Federal income tax purposes under the provisions of U.S. Internal Revenue Code, Section 332, and all other applicable sections and provisions of the U.S. Internal Revenue Code, including notice of the adoption of the plan of liquidation of Kansas Sand Company, Inc., a corporation, within 30 days to the U.S. Internal Revenue Service on Form 966 and the surviving corporation (Kansas Sand and Concrete, Inc.) shall maintain permanent records of all necessary data in accordance with Regulations, Section 1.332–6.

On December 30, 1964, the officers of both Sand and petitioner were as follows: John R. Neuner, president; Robert R. Turney, secretary; Donna Neuner, treasurer.

Pursuant to the November agreement Sand was merged into petitioner on December 31, 1964, in substantial accordance with Kan. Stat. Ann. secs. 17–3701–17–3709. As a result of this December transaction, all of petitioner's outstanding shares of capital stock remained unchanged and outstanding while each share of the common stock of Sand owned by petitioner became void. On January 1, 1965, the stock

certificate representing the 1,050 shares of Sand's stock owned by petitioner was marked canceled.

Prior to December 31, 1964, Sand engaged in the manufacture and sale of prepared concrete. As had been anticipated by Sand and petitioner, none of Sand's previously conducted business activities were terminated. Petitioner continued all such activities on and after December 31, 1964. Sand's customers generally became petitioner's customers and petitioner retained all of Sand's employees in their former occupational capacities.

On September 28, 1964, petitioner purchased all of the capital stock of another corporation, Sand. On December 31, 1964, in substantial accordance with Kansas corporation law, Sand was merged into petitioner. It appears from the positions which the parties have taken that the part of the September purchase price allocable to Sand's depreciable assets was appreciably less than Sand's basis in those same assets. The issue raised is whether petitioner must use a purchase-price basis as prescribed by section 334(b)(2) or a carryover basis as prescribed by section 362(b) in computing its allowable depreciation deduction with respect to assets which it acquired from Sand as a result of the December transaction.[2] Respondent favors the lower purchase-price basis while petitioner, in seeking larger allowable depreciation deductions, would employ the higher carryover basis.

---

[2] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

(1) IN GENERAL.—

(2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction) ; and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a period of not more than 12 months, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

SEC. 362. BASIS TO CORPORATIONS.

(b) TRANSFERS TO CORPORATIONS.—If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganizaton, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer.

Respondent argues that petitioner received the assets of Sand in a distribution considered to be in complete liquidation under section 332. He then contends that the facts here establish that since the distribution was pursuant to a plan of liquidation adopted (i) after June 22, 1954, and (ii) not more than 2 years after petitioner had acquired by purchase [3] (during a period of not more than 12 months) at least 80 percent of Sand's stock, the special rule of section 334(b)(2) requires that the basis of Sand's assets in petitioner's hands be measured by reference to petitioner's basis in Sand's stock prior to the distribution.

In opposition to respondent's analysis, petitioner contends that the transaction of December 31, 1964, was not a complete liquidation within the meaning of section 332, but was instead a reorganization as defined under section 368(a)(1)(A).[4] Petitioner does not argue that the facts in the instant case fail to satisfy the requirements of section 332(b). Instead, it urges that the "term 'complete liquidation' as used in Section 334 and Section 332 is a technical term with technical legal requirements, which include an intention to wind up the corporate affairs, gather resources, settle liabilities and cease business activity" and apparently further urges that, since this intention was

---

[3] As petitioner has not argued to the contrary, we assume that the purchase on Sept. 28, 1964, was a purchase within the meaning of sec. 334(b)(3). Otherwise sec. 334(b)(2) would not apply. See *Acro Manufacturing Co.*, 39 T.C. 377, 382 (1962), affd. 334 F.2d 40 (C.A. 6, 1964), certiorari denied 379 U.S. 887 (1964).

[4] SEC. 368 DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

(A) a statutory merger or consolidation ;

Petitioner also argues that the December transaction was a reorganization under 368(a)(1)(F). That section provides that the term "reorganization" includes "a mere change in identity, form, or place of organization, however effected." Unfortunately for petitioner this Court (in contrast to the Courts of Appeals for the Fifth and Ninth Circuits) has held that sec. 368(a)(1)(F) applies only to changes in respect of a single corporation. *Associated Machine*, 48 T.C. 318, 326–328 (1967), revd. 403 F. 2d 622 (C.A. 9, 1968) ; Rev. Rul. 69–185, 1969–1 C.B. 108 ; see also *Estate of Bernard H. Stauffer*, 48 T.C. 277 (1967), revd. 403 F. 2d 611 (C.A. 9, 1968) ; compare also *Home Construction Corp. of America*, 439 F. 2d 1165 (C.A. 5, 1971) ; *Davant* v. *Commissioner*, 366 F. 2d 874 (C.A. 5, 1966), certiorari denied 386 U.S. 1022 (1967), affirming in part and reversing in part 43 T.C. 540 (1965). But even if we were to adopt the view of sec. 368(a)(1)(F) held by the Fifth and Ninth Circuits, we would be unable to make the factual finding necessary for the legal classification of the December transaction as an (F) reorganization. While it has been stipulated that petitioner continued to carry on all of the business activities which Sand had previously conducted, there is no evidence that petitioner continued to carry on all of *its* former business activities. Consequently, there is no evidence to show that petitioner continued the business in substantially the same form after the December transaction. Furthermore, although it is true that the officers of the two corporations were the same, there is no evidence to show that the two corporations had either identical articles of incorporation or an integrated operation prior to the December transaction. *Associated Machine* v. *Commissioner*, 403 F. 2d at 625. Upon analysis of all of the relevant factors available to us, we could not conclude that the corporate enterprise continued "uninterrupted," *Davant* v. *Commissioner*, 366 F. 2d at 884, or that the instant "situation meets the ultimate benchmark by which to gauge an F reorganization—continuity in all matters of business substance." *Home Construction Corp. of America* v. *United States*, 439 F. 2d at 1172.

lacking, the December transaction cannot be considered a "complete liquidation" for the purposes of sections 332 and 334. See *William C. Kind*, 54 T.C. 600, 605 (1970).

As the facts were fully stipulated, the evidence bearing upon the "intention" of the parties with respect to the December transaction must be gleaned from those facts alone. The stipulated purpose of the November agreement which led to the December transaction was "to ease the burden of record keeping, centralize management, etc." This purpose is compatible with and does not belie the existence of the "intention" which petitioner claims is necessary for our finding that petitioner received "property distributed in complete liquidation" of Sand. Furthermore, if the stipulated facts are any indication of "intention," they would show that on December 31, 1964, Sand's separate corporate affairs *were* wound up, Sand's resources *were* gathered to be vested with petitioner, Sand's liabilities *were* settled,[5] and Sand's separate existence (and business activity) *did* cease.

It is true that the December transaction might be called a merger under the corporation laws of Kansas. However, the last sentence of section 332(b) points out that the mere circumstance that a distribution in complete liquidation (within the meaning of section 332(b)) may not have constituted a distribution or liquidation within the meaning of the corporate law under which the distribution was made does not require such a distribution to be excepted from the purview of section 332.[6] As petitioner has not shown the existence of other circumstances which would indicate that the December transaction was not a distribution in complete liquidation, section 332 must apply. Indeed the predecessor of section 332 was directed toward the type of simplification and concretion of corporate structures which occurred here. See *American Manufacturing Co.*, 55 T.C. 204, 218–220 (1970). Since the December transaction constituted a distribution in complete liquidation within the meaning of the Internal Revenue Code of 1954 and satisfied the additional requirements of section 332, it is not material that the transaction could also be described as a merger under Kansas law. Sec. 1.332–2 (d), (e), Income Tax Regs.[7]

---

[5] See Kan. Stat. Ann. secs. 17–3706 and 17–3708.

[6] SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES.

   (a) GENERAL RULE.— * * *

   (b) LIQUIDATIONS TO WHICH SECTION APPLIES.— * * *

\*     \*     \*     \*     \*     \*     \*

A distribution otherwise constituting a distribution in complete liquidation within the meaning of this subsection shall not be considered as not constituting such a distribution merely because it does not constitute a distribution or liquidation within the meaning of the corporate law under which the distribution is made; * * *

[7] (d) If a transaction constitutes a distribution in complete liquidation within the meaning of the Internal Revenue Code of 1954 and satisfies the requirements of section 332, it is not material that it is otherwise described under the local law.

If viewed as the step transaction contemplated by section 334(b)(2), the train of events (beginning with the September stock purchase, continuing through what in effect was the plan of liquidation adopted by the November agreement, and ending with the distribution of assets in December) falls squarely within the wording of that section. While petitioner urges that the two transactions might also be viewed as a purchase of all of Sand's stock followed by a reorganization of Sand with petitioner under section 368(a)(1)(A), such a view would completely ignore the relation of the September stock purchase to the question of ascertaining basis. On the facts before us we cannot disregard the interrelation of the September, November, and December transactions.

In the alternative petitioner argues that section 334(b)(2) should not be applied because it codified a judicially formulated rule which was intended to deal with certain step transactions, but which would not have been applied to the factual pattern herein. We cannot agree.

Congress has established few guidelines for the analysis of step transactions. Its avoidance of strict, objective rules in this area may be due to the practical difficulties it would face in trying to plan for the tax consequences deriving from all of the possible combinations and permutations of such steps as mergers, stock-for-stock acquisitions, stock-for-assets acquisitions, split-offs, spin-offs, split-ups, liquidations, recapitalizations, "mere" changes, partial liquidations, complete liquidations, and reincorporations. It may also fear that if statutory sections become more precisely and specifically formulated, courts would become less willing to depart from the literal statutory plan in those cases where form would otherwise triumph over substance. Thus, the courts have been left much to their own means in determining from all the facts and circumstances underlying a series of transactions whether the steps taken are part of a single, integrated transaction, all of the parts of which are interdependent, see, e.g., *Southwell Combing Co.*, 30 T.C. 487 (1958), superseding 28 T.C. 553 (1957), or whether the steps should be treated for tax purposes as separate independent transactions. See, e.g., *E. T. Griswold*, 45 T.C. 463 (1966), affd. 400 F. 2d 427 (C.A. 5, 1968).

However, by enacting section 334(b)(2), (3), and (4), Congress marked out at least one area where the integration of steps must be made by reference to certain objective definitional, chronological, and transactional criteria. See J. Chommie, Law of Federal Income Taxation 500 (1968). Those subsections were enacted in 1954 to solve some of the tax planning problems arising from the frequently recurring factual pattern exemplified in *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affd. 187 F. 2d 718 (C.A. 5, 1951), certiorari denied

342 U.S. 827 (1951). In that case, the taxpayer purchased the stock of another corporation and liquidated it within a week of acquisition. As the taxpayer's sole intention at the time of the transactions had been to acquire the other corporation's assets, we held that for the purpose of determining the taxpayer's basis in the assets acquired in liquidation the two transactions constituted a purchase of assets.[8]

Recalling our holding in *Kimbell-Diamond*, petitioner argues that section 334(b)(2) should only be applied "where the receiving corporation purchased and liquidated its subsidiary with the intent of acquiring specific assets of the purchased corporation." In support of that proposition he cites *Griswold* v. *Commissioner*, 400 F. 2d 427 (C.A. 5, 1968), affirming 45 T.C. 463 (1966), *Trianon Hotel Co.*, 30 T.C. 156 (1958), and *John Simmons Co.*, 25 T.C. 635 (1955). Petitioner's reliance on those cases is misplaced. In none of them was the applicability of section 334(b)(2) placed in issue or even discussed, the simple reason being that in each case section 334(b)(2) was inapposite on its face. In *Griswold* the purchaser-liquidator was a pair of individuals and *not* a corporation. In *Trianon* and *Simmons* the plans of liquidation were adopted long before June 22, 1954 (the date specified by section 334(b)(2)).

Contrary to petitioner's contention, no intention or purpose is made a condition to the applicability of section 334(b)(2). *Boise Cascade Corporation* v. *United States*, 288 F. Supp. 770 (D. Idaho 1968), affirmed per curiam 429 F. 2d 426 (C.A. 9, 1970); see Rev. Rul. 60–262, 1960–2 C.B. 114. The Senate committee report which accompanied the bill leading to the enactment of section 334(b)(2) (and which narrowed the applicability of the proposed section as it was reported by the corresponding House committee) indicates that section 334(b)(2) was intended to effectuate principles "derived from" *Kimbell-Diamond;* it was not intended to incorporate into the Code every nuance and ramification of the judicially conceived *Kimbell-Diamond* doctrine. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 48, 257 (1954). The objective application of section 334(b)(2) will hopefully lessen the uncertainty that arose in applying the judicial *Kimbell-Diamond* rule to later cases which presented factual variations upon the *Kimbell-Diamond* theme. Compare, e.g., *Trianon Hotel Co.*, supra, and *John Simmons Co.*, supra,

---

[8] Many cases both before and after *Kimbell-Diamond* have dealt with the same general question of equating a stock purchase followed by liquidation to a purchase of assets. See 3 Mertens, Law of Federal Income Taxation, sec. 20.165, pp. 717–721 (Zimet and Weiss rev. 1965) and cases cited therein; see also *Prairie Oil & Gas Co.* v. *Motter*, 66 F. 2d 309 (C.A. 10, 1933); *E. T. Griswold*, 45 T.C. 463 (1966), affd. 400 F. 2d 427 (C.A. 5, 1968); *Warner Co.*, 26 B.T.A. 1225 (1932); cf. *Tulsa Tribune Co.* v. *Commissioner*, 58 F. 2d 937 (C.A. 10, 1932), reversing 21 B.T.A. 1405 (1931); *Pressed Steel Car Co.*, 20 T.C. 198 (1953); *American Wire Fabrics Corporation*, 16 T.C. 607 (1951); *Illinois Water Service Co.*, 2 T.C. 1200 (1943).

with *Estate of James F. Suter*, 29 T.C. 244 (1957), and *North American Service Co.*, 33 T.C. 677 (1960) ; also see *United States* v. *M.O.J. Corporation*, 274 F. 2d 713 (C.A. 5, 1960) ; *United States* v. *Mattison*, 273 F. 2d 13 (C.A. 9, 1959) ; The *South Bay Corporation* v. *Commissioner*, 345 F. 2d 698 (C.A. 2, 1965), modifying *Utilities & Industries Corporation*, 41 T.C. 888 (1964) ; Rev. Rul. 60–246, 1960–2 C.B. 462.[9]

We do not hold that the rule of section 334(b) (2) must be applied inflexibly regardless of steps or events which may precede or succeed the specific steps contemplated in that section. Cf. *American Manufacturing Co., supra.* And, while consistency may require that a transaction or series of transactions falling under section 334(b) (2) should, for related purposes, be treated as the purchase by one corporation of the assets of another corporation, *Argus, Inc.*, 45 T.C. 63, 69 (1965), our decision today does not necessarily require that a transaction considered a distribution in complete liquidation within the meaning of section 332 for the purpose of applying section 334(b) (2) may not be considered a reorganization under section 368(a) (1) (A) for some other unrelated purpose. See Bittker & Eustice, "Complete Liquidations and Related Problems," 26 Tax L. Rev. 191, 226 (1971) ; cf. *King Enterprises, Inc.* v. *United States*, 418 F. 2d 511 (Ct. Cl. 1969). On the basis of the record before us, we hold only that petitioner's actions came within the purview of section 334(b) (2) as written and as intended.

Reviewed by the Court.

> *Decision will be entered for the respondent in docket No. 1854–69.*
>
> *Decision will be entered under Rule 50 in docket No. 3833–69.*

---

[9] We should note that at least one court has concluded that the general principles of the *Kimbell-Diamond* doctrine have not been entirely preempted by the enactment of sec. 334(b)(2). *American Potash & Chemical Corporation* v. *United States*, 399 F. 2d 194 (Ct. Cl. 1968), supplemented by 402 F. 2d 1000 (Ct. Cl. 1968).